# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

NEW YORK STATE ASSEMBLYWOMAN
DIANA C. RICHARDSON and NEW YORK
STATE SENATOR ZELLNOR Y. MYRIE,

*Plaintiffs*,

*v.*

THE CITY OF NEW YORK, Mayor BILL de
BLASIO; NYPD Commissioner DERMOT SHEA;
NYPD Chief of Department RODNEY HARRISON,
as successor in interest to TERENCE MONAHAN
(retired); and NYPD Members of the Service
JOSEPH B. TAYLOR, JESSICA CLINTON,
GIOVANNI CALDERON, SOLOMON C. JACOBS,
JORGE PEREZ, and JOHN DOE #1,

*Defendants*.

Case No. 21-cv-3609

**JURY TRIAL DEMANDED**

## PRELIMINARY STATEMENT

1.      This case arises from the collision of two deadly pandemics.  In the midst of the unprecedented COVID-19 health crisis, hundreds of thousands of protestors took to the streets to speak out against a more deeply rooted threat to the health and safety of New Yorkers: the long and unbroken history of police violence against Black Americans.  The protests were prompted by the unjust police killings of two Black Americans in the spring of 2020.

2.      On March 13, 2020, a Black woman named Breonna Taylor was shot and killed by Louisville police in her own home after officers entered her apartment using a no-knock warrant and opened fire.

3.      On May 25, 2020, a Black man named George Floyd was killed when a Minneapolis police officer kneeled on Mr. Floyd's neck for nine minutes and twenty-nine seconds, suffocating him.

4.      The brutal and senseless killings of George Floyd and Breonna Taylor at the hands of police officers sparked some of the largest civil rights protests in our nation's history. But instead of protecting American citizens seeking to make their country more equal by exercising rights they are guaranteed by the United States Constitution, police departments across the country viciously retaliated against demonstrators, using violent tactics to shut down protests and silence protestors.

5.      Four days after George Floyd's murder, two Black New York lawmakers, New York State Senator Zellnor Myrie and New York State Assemblywoman Diana Richardson, attended a protest in Brooklyn to voice their outrage at this latest tragedy in a long-standing history of police brutality against Black citizens.

6.      As trusted local representatives who maintain professional working relationships with the NYPD, they believed their presence could help foster a peaceful atmosphere.  And as Black Americans, they wanted to add their voices to the chorus of New Yorkers protesting police brutality and racial injustice.

7.      But their status as elected officials, their positive relationships with local police departments, and their own peaceful conduct could not protect Senator Myrie and Assemblywoman Richardson from being harmed at the hands of NYPD officers.

8.      After hours of marching peacefully near the Barclays Center, NYPD officers arbitrarily decided to end the protest.  There was no curfew in place at the time, nor any indication when the protest began that the NYPD would seek to end it by 8 PM.

9.      NYPD officers played a barely audible recording to the protestors apparently asking them to leave the area.  But, before giving the protestors a chance to leave, the officers advanced and attacked the crowd.

10.     Without warning, NYPD officers moved into a tactical formation and advanced on a group of protestors that included Senator Myrie and Assemblywoman Richardson, ostensibly to move the protestors away from the Barclays Center.

11.     The NYPD officers then encircled the group, making it impossible for them to leave.

12.     Wielding their department-issued bikes as weapons, officers rammed Senator Myrie, Assemblywoman Richardson and other protestors with their bike wheels over and over again.

13.      Without notice, NYPD officers then pepper sprayed Senator Myrie, Assemblywoman Richardson and other trapped protestors, making it difficult for them to breathe and impossible for them to see.

14.     Although the Assemblywoman was dragged to safety by nearby good Samaritans who helped tend her injuries, Senator Myrie was not so lucky.  While Senator Myrie was blinded by pepper spray and in searing pain, several officers descended on him and arrested him, even though he had done nothing wrong.

15.     The experience was a painful and humiliating reminder that following the rules and complying with police orders does not protect Black Americans from police brutality, not even Black Americans who have ascended to elected office.

16.     The conduct of the NYPD on May 29 reinforced another ugly truth—one that the January 6, 2021 riots in the Capitol made crystal clear: that police treat speech as threatening not because of how protestors behave, but because of who they are and what they are protesting.

17.     Senator Myrie and Assemblywoman Richardson bring this action to vindicate their rights and the rights of their constituents to peacefully stand up for racial justice and speak out against police brutality free from the threat of police violence.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over Plaintiffs' federal claims brought under 42 U.S.C. § 1983 pursuant to 28 U.S.C. §§ 1331 and 1343(a), and over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

19.     Plaintiffs' claim for declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983, Rule 57 of the Federal Rules of Civil Procedure, and the Court's inherent equitable authority.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), as the events giving rise to Plaintiffs' claims arose in the Eastern District of New York.

## PARTIES

21.     Plaintiff Zellnor Y. Myrie is a New York State Senator who resides in Brooklyn. Senator Myrie has represented more than 300,000 Brooklyn residents from New York's 20th Senate District since 2019.

22.     Plaintiff Diana C. Richardson is a New York State Assemblywoman who resides in Brooklyn.  Assemblywoman Richardson has represented more than 125,000 Brooklyn residents from New York's 43rd Assembly District since 2015.

23.     Defendant City of New York (the "City") is a municipal corporation organized and existing under the laws of the State of New York and maintains its principal office in the County of New York.  The New York City Police Department ("NYPD") is an agency of the City charged with law enforcement.

24.     Defendant Bill de Blasio is the mayor of the City of New York and chief policymaking official with respect to City policy generally, including NYPD policy.  He is sued in his official capacity.

25.     Defendant Dermot F. Shea is the New York City police commissioner, who has final policymaking authority with respect to the NYPD and responsibility for the hiring, screening, training, retention, supervision, discipline, counseling and control of the police officers under his command who are or were employed by the NYPD.  He is sued in his official capacity.

26.     Defendant Rodney Harrison is the Chief of Department for the NYPD (collectively, with Defendants de Blasio, Shea, and City of New York, the "City Defendants"). He is sued in his official capacity, as successor in interest to Terence A. Monahan, who retired as Chief of Department in February 2021.  As the highest-ranking uniformed officer of the NYPD, Chief Monahan was delegated final policymaking authority with respect to NYPD policies, including, but not limited to, those related to management of protests, use of force, and arrests.

27.     Defendant Joseph B. Taylor is a Captain in the NYPD.  Upon information and belief, Defendant Taylor is a member of the Strategic Response Group ("SRG") 3 Command within the NYPD.

28.     Defendant Jessica Clinton is an Officer in the NYPD with Shield Number 17324. Upon information and belief, Defendant Clinton is a member of the SRG 3 Command within the NYPD.

29.     Defendant Giovanni Calderon is a Sergeant in the NYPD with Shield Number 1638.  Upon information and belief, Defendant Calderon is a member of the SRG 4 Command within the NYPD.

30.     Defendant Solomon C. Jacobs is an Officer in the NYPD with Shield Number 9290.  Upon information and belief, Defendant Jacobs is a member of the SRG 4 Command within the NYPD.

31.     Defendant Jorge Perez is an Officer in the NYPD with Shield Number 13859. Upon information and belief, Defendant Perez is a member of the SRG 4 Command within the NYPD.

32.     Defendant John Doe #1 is an NYPD uniformed member of service whose identity is unknown at this time (collectively with Defendant Taylor, Defendant Clinton, Defendant Calderon, Defendant Jacobs, and Defendant Perez, the "Defendant-Officers").  The Defendant-Officers are sued in their official and individual capacities.

## JURY DEMAND

33.     Plaintiffs demand a jury trial.

## FACTS

***A.***     ***The Unjust Police Conduct at the May 29, 2020 Barclays Center Protest Caused Plaintiffs' Injuries.***

***The murders of Breonna Taylor and George Floyd Sparked widespread protests in New York City.***

34.     On March 13, 2020, an unarmed Black woman named Breonna Taylor was shot at least eight times and killed by Louisville police in her own home after the officers entered her apartment using a no-knock warrant and opened fire.

35.     On May 25, 2020, four Minneapolis police officers killed George Floyd, an unarmed Black man.  Officer Derek Chauvin suffocated Mr. Floyd by holding his knee on Mr. Floyd's neck for nine minutes and twenty-nine seconds.  The following day, videos made by witnesses became public and were shared widely.

36.     These killings, in the context of the deaths of so many other unarmed Black Americans at the hands of police, triggered some of the largest and most widespread civil rights protests in the history of the United States.

37.     Peaceful protesters gathered in cities across the country to demonstrate against police brutality and racial injustice, with the largest and most high-profile protests in New York City occurring from May 28 through June 5, 2020 (collectively, "2020 Racial Justice Protests").

***Plaintiffs attended the May 29, 2020 protest at the Barclays Center in their professional and personal capacities.***

38.     On Friday, May 29, 2020, Plaintiffs Myrie and Richardson attended one such protest, outside of the Barclays Center in Brooklyn, New York (the "May 29 protest"). They attended the protest together in their professional and personal capacities.

39.     As elected officials, Plaintiffs felt they had a responsibility to stand in solidarity with their constituents, whose participation in these peaceful protests reflected their concern with policing and racial injustice in their own communities. Plaintiffs also hoped that their close and positive working relationship with local police precincts and with their constituents would promote peace and respect between the police and protestors and help protect the First Amendment rights of Brooklyn community members.

40.     In addition, as Black Americans, Plaintiffs were outraged and saddened by the brutal killings of George Floyd, Breonna Taylor, and other unarmed Black people at the hands of police. Plaintiffs wanted to grieve with their community and join their neighbors in calling for police accountability and racial justice.

***Plaintiffs made themselves identifiable to the NYPD as elected officials at the May 29 protest and communicated with NYPD officers prior to protesting.***

41.     As part of his effort to serve as a liaison between the NYPD and the Brooklyn community, Senator Myrie communicated with the NYPD before joining the May 29 protest.

On May 29, before heading to the protest, Senator Myrie sent a text message to NYPD Chief Jeffrey B. Maddrey to inform Chief Maddrey that he was heading to the protest and to ensure that Chief Maddrey had his contact information.

42.     At the time, Chief Maddrey was the Commanding Officer of Patrol Borough Brooklyn North, which includes the Barclays Center.[1]  Senator Myrie had interacted with Chief Maddrey on several occasions before the May 29 protest because two of Chief Maddrey's precincts as Commanding Officer of Brooklyn North were in Senator Myrie's Senate district.

43.     In addition to reaching out to Chief Maddrey before attending the May 29 protest, the Plaintiffs took steps to make themselves identifiable by police and protestors at the Barclays Center.  Senator Myrie wore a neon green or yellow t-shirt with "Senator Myrie" emblazoned across the back in large, bold, black letters.

44.     At the protest, several constituents noticed Senator Myrie's bright, conspicuous shirt and approached him to speak to him in his capacity as an elected official.  Senator Myrie's shirt is visible in the image below.[2]

---

[1]     Chief Maddrey is now the NYPD's Chief of Community Affairs.
[2]     Senator Zellnor Y. Myrie (@zellnor4ny), TWITTER (May 30, 2020, 2:42 PM), https://twitter.com/zellnor4ny/status/1266802303807500288/photo/1.



45.     Assemblywoman Richardson went to the protest wearing a black face covering with large white lettering that read "Team Richardson."  At the protest, several constituents and NYPD officers recognized Assemblywoman Richardson and approached her to speak to her in her capacity as an elected official.  Assemblywoman Richardson's face covering is visible in the image below, captured in a video taken after Assemblywoman Richardson was pepper sprayed.[3]



---

[3]     Gwynne Hogan (@GwynneFitz), TWITTER (May 29, 2020, 11:35 PM), https://twitter.com/GwynneFitz/status/1266573860008275968.

46.     In addition to contacting Chief Maddrey before heading to the May 29 protest, Plaintiffs greeted police officers in attendance when they arrived at the protest and spoke to an officer they knew from their work as Brooklyn-based elected officials.

***Plaintiffs observed peaceful protestors and a heavy police presence at the May 29 protest.***

47.     Assemblywoman Richardson and Senator Myrie arrived together at the protest in the early evening on May 29, 2020.

48.     They saw protestors gathered in the plaza in front of the Barclays Center stadium and on the sidewalk close to the stadium.  The protestors were peacefully chanting and talking with one another.  Plaintiffs took in the scene around them and spoke to constituents and other protestors.

49.     The May 29 protest was marked by a heavy NYPD presence.  The officers appeared to be from numerous precincts and units.  Some officers wore regular blue patrol uniforms.  Some officers donned blue collared shirts.  Other officers had on white collared shirts. Other officers wore shirts that were neon green or yellow at the top and were carrying or pushing bicycles (the "bicycle officers").

50.     The photograph below depicts the bicycle officers who were wearing shirts with neon green or yellow at the top and wielding bicycles for purposes of crowd control.[4]

---

[4]     Photograph of protestors and New York City police officers outside the Barclays Center, May 29, 2020. REUTERS/Caitlin Ochs.



51.     Additional officers were outfitted in all black, with some wearing what appeared to be riot gear or tactical armor.  The photograph below shows the officers wearing all black and carrying various types of riot gear or tactical armor.[5]



---

[5]     Photograph of New York City police officers with riot shields outside the Barclays Center, May 29, 2020. REUTERS/Shannon Stapleton.

***The NYPD suddenly sought to disperse protestors without warning and for no apparent reason.***

52.     Shortly before 8 PM, the NYPD officers began playing a prerecorded message through megaphones to the protestors.  The message was difficult to hear, but Plaintiffs understood it to mean that the police wanted the protestors to leave the area outside the Barclays Center.

53.     The police did not explain why the protestors suddenly needed to leave.

54.     The City of New York had not imposed a curfew as of May 29, 2020.

55.     There was no apparent reason for the police to suddenly tell the protestors to disperse.

56.     As the recording was playing, the NYPD moved into a tactical formation and advanced on the crowd of protestors.

57.     The bicycle officers were in a row in front closest to the protestors.

58.     Behind the bicycle officers, there was a row of officers wearing all black and armed with riot gear.

***The NYPD then surrounded and "kettled" Plaintiffs so that they were unable to disperse.***

59.     After hearing the pre-recorded message from police apparently asking the protestors to leave the area, Senator Myrie, Assemblywoman Richardson and other protestors started heading southeast down Flatbush Avenue in the direction the police officers were directing them.

60.     Even though Plaintiffs and other protestors were walking on the public sidewalk and moving away from the Barclays Center as directed by the police, a group of NYPD officers advanced in quick succession on Senator Myrie, Assemblywoman Richardson, and nearby

protestors, forcing them into the middle of the street on Flatbush Avenue and up against a large group of other protestors attempting to disperse.

61.     The advancing officers were yelling at Senator Myrie, Assemblywoman Richardson, and the protestors around them to move back and were pushing them farther into the street on Flatbush Avenue.  Senator Myrie, Assemblywoman Richardson, and other protestors complied, to the best of their ability, with the officers' instructions and continued to walk away from the area and away from the police, as directed.

62.     In retreating from the police and leaving the area around the Barclays Center, Plaintiffs were at times facing the police and being pushed backwards into the protestors ahead of them, and they were at times turned away from the police and facing the back of the group of protestors ahead of them.  When Plaintiffs were walking away with their backs turned to the officers, Senator Myrie's neon green or yellow t-shirt printed with "Senator Myrie" in large lettering was clearly visible to the police officers.  When Plaintiffs were facing the officers, Assemblywoman Richardson's "Team Richardson" face covering was clearly visible to the police officers.

63.     Plaintiffs tried to move away from the officers as quickly as possible, but were unable to move any faster than they did because the police were closing in on Plaintiffs and pushing them into the large crowd of protestors in front of Plaintiffs.  Given their positioning between the officers and the crowd, Plaintiffs were unable to move laterally out of the way of the officers and could only move with the crowd.

64.     In other words, the officers "kettled" Senator Myrie, Assemblywoman Richardson, and the protesters near them.

65.     "Kettling," also known as "encirclement," or "trap and detain," refers to an ostensible crowd-control tactic in which police encircle and corral protesters in confined areas, in order to trap them and begin arresting them.[6]  According to law enforcement experts, kettling tactics "greatly increase the likelihood of conflict" between police and civilians.[7]

66.     After kettling the Plaintiffs, the officers continued to advance toward Plaintiffs and scream at them to move back, full well knowing there was nowhere for Plaintiffs to go.

***The NYPD assaulted Assemblywoman Richardson and Senator Myrie with bicycles.***

67.     While Assemblywoman Richardson was following the officers' instructions and trying to move backwards away from the officers, the bicycle officers in front of the mass of police made a barricade with their bicycles in front of their bodies, one bike after another in a straight line, between themselves and the protestors.  All of a sudden, in a coordinated fashion, the bicycle officers began attacking Plaintiffs and other retreating protestors with police bicycles.

68.     The bicycle officers forcibly rammed their bicycles into Assemblywoman Richardson's legs, lower abdomen, and pelvic area, hitting her repeatedly.

69.     The bicycle officers did not provide any warning to Assemblywoman Richardson before hitting her with their bicycles.

70.     Assemblywoman Richardson asked the police officers what they were doing as she tried to protect her body from the onslaught.  The officers did not respond verbally to Assemblywoman Richardson's questions.  Instead, they continued to hit her.

---

[6]     Wyatte Grantham-Philips, Tyler J. Davis, and Nick Coltrain, *What is kettling? Here's a look into the usage and history of the controversial police tactic*, USATODAY (June 24, 2020 2:49 PM EDT), https://www.usatoday.com/story/news/nation/2020/06/24/kettling-controversial-police-tactic-black-lives-matter-protests/3248681001/ (last updated June 25, 2020 1:57 PM EST).

[7]     Ali Watkins, *'Kettling' of Peaceful Protesters Shows Aggressive Shift by N.Y. Police,* N.Y. TIMES (June 5, 2020), https://www.nytimes.com/2020/06/05/nyregion/police-kettling-protests-nyc.html?action=click&module=Top%20Stories&pgtype=Homepage (last updated December 11, 2020).

71.     Senator Myrie was following the officers' instructions and trying to walk away, as directed, but was  stuck behind a group of protestors in front of him.  While Senator Myrie's back was toward the police, the bicycle officers attacked him.

72.     The bicycle officers began forcibly ramming bicycles into Senator Myrie's back, arms, and legs, hitting him repeatedly.

73.     The bicycle officers gave no warning to Senator Myrie before striking him with the bicycles.

74.     Senator Myrie reacted to the bicycle officers' attack by telling them that he was complying with their orders.  He asked the officers why they were hitting him and other protestors when they were following the officers' instructions.  The officers did not respond verbally to Senator Myrie's questions.  Instead, in response to his questions, they continued to ram him with their bicycles.

75.     Assemblywoman Richardson and Senator Myrie attempted to move further away from the police, as they were being struck repeatedly with bicycles, but because Assemblywoman Richardson and Senator Myrie were "kettled" and trapped between the crowd of protestors in front of them and the police behind them, they were unable to move more quickly away from the police.

***The NYPD pepper sprayed Assemblywoman Richardson for questioning the NYPD's use of excessive force.***

76.     Within seconds after Assemblywoman Richardson was attacked by the bicycle officers and questioned their unjustified use of force, a second wave of officers descended on her.  One male officer and one female officer, both wearing all black, emerged behind the bicycle officers and rushed Assemblywoman Richardson.

77.     Upon information and belief, the female officer was Defendant Officer Jessica Clinton, Shield Number 17324 and a member of the SRG 3 Command.

78.     Upon information and belief, the male officer was Defendant Officer Jorge Perez, Shield Number 13859 and a member of the SRG 4 Command.

79.     Defendant Perez raised his fists as if to fight Assemblywoman Richardson, and then pepper sprayed her directly in her eyes.

80.     Neither Defendant Perez nor Defendant Clinton issued a warning to Assemblywoman Richardson before attacking her, and she had no way to retreat from the police faster than she was already retreating.

81.     Assemblywoman Richardson was immediately blinded by the pepper spray and in excruciating pain.  She lost her shoes and was pushed to the ground, twisting her right foot.  She was terrified.

82.     As she was being attacked by the police, Assemblywoman Richardson heard her colleague Senator Myrie screaming her name, with terror and fear in his voice, the way you never want anyone to scream your name.  As he was screaming for her, Senator Myrie's voice grew more and more faint as he was pulled away by the police.

83.     Nearby protestors saw Assemblywoman Richardson in distress on the ground. They helped her off the ground, carried her to the side of the crowd, and poured water and milk in her eyes.  Blinded and in pain, Assemblywoman Richardson knelt in the street, forced to entrust her safety to complete strangers.  Eventually, thanks to the good Samaritans who helped her, Assemblywoman Richardson regained her vision.  She then went to try to find Senator Myrie.

84.     A photographer captured these good Samaritans assisting Assemblywoman Richardson as she tried to flush the pepper spray out of her eyes.[8]



85.     In the attack, Assemblywoman Richardson's face covering—used to protect herself and others from COVID-19—was saturated with pepper spray, rendering it useless.

86.     After she was pepper sprayed, Assemblywoman Richardson identified Defendant Clinton's name and badge number, and recounted the attack by police, in a video recorded by a reporter for WNYC.[9]

87.     The officers' pepper spraying of Assemblywoman Richardson was an unreasonable seizure.

88.     No police officers interceded on behalf of Assemblywoman Richardson, as she was being hit with bicycles and/or pepper sprayed, despite the presence of numerous officers.

89.     The failure of officers to intervene to stop the NYPD's use of excessive force against Assemblywoman Richardson violated the NYPD's Use of Force Policy, Procedure

---

[8]     Photograph of Assemblywoman Diana Richardson, May 29, 2020. Lev Radin.
[9]     Gwynne Hogan (@GwynneFitz), TWITTER (May 29, 2020, 11:35 PM), https://twitter.com/GwynneFitz/status/1266573860008275968.

Number 221-02, which notes that "[a]ll members of the service must intervene to stop another member of the service from using excessive force."[10]

90.     Assemblywoman Richardson was not engaged in any criminal activity at the time of her assault by police.

91.     When the police officers attacked Assemblywoman Richardson, those officers were not in physical danger from Assemblywoman Richardson or anyone else.

92.     Assemblywoman Richardson was not charged with a crime or misdemeanor and was not issued a citation.

93.     The police officers who hit Assemblywoman Richardson with bicycles and pepper sprayed her did not have any justification for doing so.  The police officers attacked Assemblywoman Richardson because she was protesting police brutality and because she questioned the officers' use of excessive force.

94.     The NYPD's assault with bicycles and pepper spraying of Assemblywoman Richardson violated the Department's Use of Force Policy, Procedure Number 221-02, which instructs officers to "[u]tilize de-escalation techniques when appropriate and consistent with personal safety, which may reduce or eliminate the need to use force, and increase the likelihood of gaining the subject's voluntary compliance," and, if such de-escalation techniques fail, to "[a]dvise the offender that physical force or other devices (e.g., O.C. pepper spray) . . . will be used to handcuff/restrain him/her before applying such force, if appropriate."  The Use of Force Policy also notes that: "Members of the service should not use O.C. Pepper Spray, Conducted Electrical Weapon, or impact weapons on persons who are passively resisting."

---

[10]   New York City Police Department, Patrol Guide Proc. No. 221-02, available at https://www1.nyc.gov/assets/ccrb/downloads/pdf/investigations_pdf/pg221-02-use-of-force.pdf (hereinafter "Use of Force Policy").

Assemblywoman Richardson was not even passively resisting when the NYPD used force against her—she was trying to follow their orders.

***The NYPD pepper sprayed and arrested Senator Myrie for questioning the NYPD's use of excessive force.***

95.     As Senator Myrie was being hit by police officers with bicycles and questioning their unjustified use of force, an officer wearing all black ("John Doe #1") raised a cannister of pepper spray and sprayed it into Senator Myrie's eyes.

96.     Senator Myrie immediately felt unbearable pain.  He was blinded and terrified. He cried out in pain.

97.     John Doe #1 did not issue a warning before spraying Senator Myrie.

98.     At the time John Doe #1 pepper sprayed Senator Myrie, it was clear to John Doe #1 that Senator Myrie could not leave the area as he was trapped between the police behind him and the protestors in front of him.

99.     In quick succession, officers started yelling "cuff him," and several officers descended on Senator Myrie, grabbing him, forcing his hands behind his back and handcuffing him by securing his wrists in zip ties.

100.     Upon information and belief, among the officers who handcuffed Senator Myrie were Defendant Captain Joseph B. Taylor, a member of the SRG 3 Command, and Defendant Sergeant Giovanni Calderon, Shield Number 1638 and a member of the SRG 4 Command.

101.     The officers' pepper spraying of Senator Myrie was an unreasonable seizure.

102.     Senator Myrie was arrested when he was handcuffed with zip ties.  The officers who arrested Senator Myrie did not have probable cause to arrest him.

103.    A photographer for Reuters captured the moment after Senator Myrie was pepper sprayed, as officers were arresting him.[11]



104.    During the assault of Senator Myrie with bicycles and pepper spray, Senator Myrie's face covering—used to protect himself and others from COVID-19—came off his face. Once arrested, Senator Myrie could not put his mask back on his face because his hands were restrained with zip ties.  The NYPD did not offer Senator Myrie a new mask.

105.    After being pepper sprayed, Senator Myrie's eyes and nose were visibly and excessively running, and he had difficulty breathing.  Police officers did not offer Senator Myrie any medical assistance.

106.    No police officers interceded on behalf of Senator Myrie, as he was being hit with bicycles, pepper sprayed, and/or arrested, despite the presence of numerous officers.

---

[11]    Photograph of State Senator Zellnor Myrie being arrested after being pepper sprayed, May 29, 2020. REUTERS/Shannon Stapleton.

107.    The failure of officers to intervene to stop the NYPD's use of excessive force against Senator Myrie violated the NYPD's Use of Force Policy, Procedure Number 221-02, which notes that "[a]ll members of the service must intervene to stop another member of the service from using excessive force."

108.    The above Reuters photograph depicts an officer wearing a white shirt, forcing Senator Myrie's arms behind his back as he cried out in agony with pepper spray covering his face.  Upon information and belief, the officer wearing a white shirt depicted in the photograph above is Defendant Captain Joseph B. Taylor.

109.    Upon information and belief, blue-shirted rank-and-file NYPD officers are directly supervised by Captains, Lieutenants, Inspectors, and Detectives, many of whom dress in white shirts that signify their senior rank and supervisory roles.

110.    Upon information and belief, Defendant Taylor, was wearing a white shirt at the May 29, 2020 protest because he has a supervisory role within the NYPD.

111.    Upon information and belief, Defendant Taylor, along with other higher-ranking members of the NYPD, have the authority to give direct orders to lower ranking officers.

112.    Senator Myrie shouted out Assemblywoman Richardson's name repeatedly in an attempt to locate his colleague, as two officers pulled him away toward police buses near the Barclays Center plaza where the NYPD was detaining other arrested protestors.  Upon information and belief, Defendant Taylor handed Senator Myrie off to the two officers to be escorted in police custody to the police buses.

113.    A photographer for The Gothamist captured Senator Myrie being taken by police towards the police buses.  Upon information and belief, Defendant Calderon and Defendant

Jacobs are the two officers who are pictured escorting Senator Myrie towards the police buses.[12]



114.    The officers took Senator Myrie to the police buses, where he waited in line with other protestors who had been arrested.

115.    Senator Myrie was still in excruciating pain.  His eyes were burning and mucus was running down his face.  He continued to have difficulty breathing.  He cried out, "my eyes, my eyes," and asked the officers who were with him for medical assistance.  The officers ignored his pleas for help—they did not respond verbally or offer any medical assistance to Senator Myrie.  Once he arrived at the line for the buses, one officer continued to hold Senator Myrie's arm while they stood in the line of arrested protestors.  Upon information and belief, the officer who continued to hold Senator Myrie's arms in line was Defendant Jacobs.

---

[12]    Photograph of State Senator Zellnor Myrie, under arrest, being escorted towards police buses after being pepper sprayed, May 29, 2020. The Gothamist/Scott Heins.

116.    The officers did not have probable cause to arrest Senator Myrie.  The arrest of Senator Myrie was unlawful.

117.    The NYPD's assault with bicycles and pepper spray, and the handcuffing of Senator Myrie violated the Department's Use of Force Policy, Procedure Number 221-02, which instructs officers to "[u]tilize de-escalation techniques when appropriate and consistent with personal safety, which may reduce or eliminate the need to use force, and increase the likelihood of gaining the subject's voluntary compliance," and, if such de-escalation techniques fail, to "[a]dvise the offender that physical force or other devices (e.g., O.C. pepper spray . . . ) will be used to handcuff/restrain him/her before applying such force, if appropriate."  The Use of Force Policy also notes that: "Members of the service should not use O.C. Pepper Spray, Conducted Electrical Weapon, or impact weapons on persons who are passively resisting."  Senator Myrie was not even passively resisting when the NYPD used force against him and arrested him—he was trying to follow their orders.

***Senator Myrie was released from custody when he was recognized as an elected official.***

118.    Eventually, a police officer spotted and recognized Senator Myrie as an elected official and pulled Senator Myrie off the line of arrested protestors.

119.    Chief Maddrey then came over to Senator Myrie and directed the police officers to cut his zip ties and get him medical attention.

120.    Upon Chief Maddrey's instructions, Senator Myrie was removed from the line, his zip ties were removed, and an emergency medical professional washed his eyes with cold water and gave him a cloth to wipe away the pepper spray.

121.    After receiving treatment, Senator Myrie remained seated on the curb and tried to catch his breath and compose himself.

122.     Senator Myrie was not engaged in any criminal activity at the time of his assault and arrest by police.  Senator Myrie was not a threat to the safety of the police or others.  Senator Myrie did not resist arrest or attempt to evade arrest.  Senator Myrie was not charged with a crime or misdemeanor and was not issued a citation.

123.     The police officers who hit Senator Myrie with bicycles, pepper sprayed him, and arrested him had no justification for doing so.  The police officers used force against and falsely arrested Senator Myrie because he was protesting police brutality and racial injustice and because he questioned the officers' use of excessive force.

***Assemblywoman Richardson found Senator Myrie and they left the protest.***

124.     Assemblywoman Richardson found Senator Myrie sitting down near the police buses, after someone in the crowd of protestors informed her that Senator Myrie had been arrested and directed her to where Senator Myrie had been taken.  Chief Maddrey was still with Senator Myrie when Assemblywoman Richardson found him.

125.     Assemblywoman Richardson was not offered medical attention or treatment by any police officers even though she was visibly suffering from the pepper spray.

126.     The NYPD's failure to offer or provide medical attention or treatment to Assemblywoman Richardson violates the NYPD's Use of Force Policy, Procedure Number 221-02, which instructs officers to "inquire if subject requires medical attention and document response to inquiry," and to ensure a subject who is injured or ill "receives <u>immediate</u> medical attention" (emphasis in original).

127.     At least one police officer was assigned to stay with Senator Myrie and Assemblywoman Richardson until they left the protest.  Plaintiffs understand the officer was assigned to protect them from the actions and tactics of *other* police officers.

128.    Later that day, Mayor de Blasio called Senator Myrie and left a voicemail on his cell phone apologizing for the conduct of the NYPD.  Mayor de Blasio also attempted to call Assemblywoman Richardson in the days following her assault.

***Assemblywoman Richardson and Senator Myrie suffered physical and emotional injuries from the brutality inflicted by the NYPD.***

129.    Assemblywoman Richardson and Senator Myrie suffered physical and emotional injuries after they were assaulted by police officers with bicycles and pepper spray, and after Senator Myrie was falsely arrested.

130.    Assemblywoman Richardson has struggled personally and professionally due to physical, emotional, and psychological injuries resulting from her assault by the NYPD on May 29, 2020.  Assemblywoman Richardson experienced soreness and bruising to her legs and pelvic area from the repeated bicycle assaults.  She felt pain in her eyes, suffered from hazy vision, and developed a persistent crust around her eyes in the aftermath of the May 29 protest. Assemblywoman Richardson has continued to have medical issues involving her right eye since she was pepper sprayed, including buildup of crust and eye infections.  She also twisted her right foot when she was assaulted with bicycles and pushed to the ground by the NYPD, aggravating a previous injury.

131.    Assemblywoman Richardson has suffered from difficulty sleeping, depression, anxiety, and feelings of being unsafe as a result of the NYPD's conduct.

132.    Assemblywoman Richardson's experience has made her feel anxious about attending other protests or events with large crowds, out of fear that she could be assaulted by the police again.  This anxiety has interfered with her work as an elected official, which often requires her to attend events with large crowds.

133.     Senator Myrie suffered pain and injury to his back from the assault with bicycles and pain in his eyes and headaches from the pepper spray for several days following the May 29 protest.

134.     Senator Myrie has also experienced depression, anxiety, and despair as a result of his assault and arrest by the NYPD.  He has experienced residual trauma that has impeded his ability to participate in activities related to his job as a State Senator and has interfered with his ability to perform professionally to his fullest capacity.  For example, Senator Myrie has been unable to attend events, including but not limited to protests, with a large police presence.  He has also been unable to act as an effective peacemaker in interactions between the NYPD and the community he serves in the Senate, due to the fact that he was assaulted and arrested in his attempt to do so on May 29, 2020.

**B.     The City's Unconstitutional Policies, Practices, and/or Customs Caused Plaintiffs' Injuries.**

135.     The Defendant-Officers acted pursuant to the City of New York's unconstitutional policies, practices, and/or customs.  These policies, practices, and customs were the moving force behind the Defendant-Officers' violation of Plaintiffs' constitutional rights.

136.     The policies, practices, and/or customs that motivated the Defendant-Officers' actions include but are not limited to: (a) "kettling," encircling, corralling, or otherwise "trapping and detaining" (collectively, "kettling") peaceful protesters en masse, without permitting them an opportunity to disperse, augmenting the risk of physical conflict; (b) using bicycles as weapons to bludgeon and batter peaceful protesters; (c) arresting peaceful protestors without probable cause; (d) chilling, preventing, or otherwise deterring protesters from engaging in similarly protected speech in the future, particularly on the subject of police brutality and racial injustice; and (e) taking action against protesters pursuant to vague and ineffectual dispersal orders.

137.    As a result of these unconstitutional policies, practices, and/or customs, NYPD officers repeatedly violated protesters constitutional rights at the 2020 Racial Justice Protests. The Civil Complaint Review Board ("CCRB") received 1,646 protest-related allegations associated with 248 incidents occurring between May 28 and June 20, 2020.  The CCRB ultimately undertook investigations relating to approximately 300 incidents.[13]

### The City has a policy, practice, or custom of kettling peaceful protesters without permitting them an opportunity to leave.

138.    The NYPD has a long and well-documented history of abusively employing kettling tactics against protesters at peaceful demonstrations.  At past protests, such as the Occupy Wall Street protests of 2011 and 2012, the NYPD has repeatedly deployed "abusive and unlawful protest regulation and policing practices," including but not limited to the "kettling (corralling and trapping) of protesters."[14]

139.    Although NYPD policy further requires that protesters be offered the opportunity to leave when within a police formation, upon information and belief, protesters at the 2020 Racial Justice Protests were given no chance to disperse.

### i.    City officials with policymaking authority have endorsed kettling of peaceful protesters without giving them a sufficient opportunity to disperse.

140.    Defendants Mayor de Blasio, Commissioner Shea, and Chief Harrison are municipal officials with policymaking authority.  City policymaking officials have acknowledged, participated in, or otherwise approved of the NYPD's policy, practice, or custom

---

[13]    *See* Anthony M. DeStefano, *Civilian board pursues nearly 300 complaints about NYPD handling of George Floyd protests*, NEWSDAY (Mar. 15, 2021 6:27 PM) https://www.newsday.com/news/new-york/nypd-misconduct-george-floyd-protests-ccrb-1.50183864.

[14]    Protest & Assembly Rights Proj., SUPPRESSING PROTEST: HUMAN RIGHTS VIOLATIONS IN THE U.S. RESPONSE TO OCCUPY WALL STREET *vi* (2012), http://hrp.law.harvard.edu/wp-content/uploads/2013/06/suppressing-protest-2.pdf (hereinafter Suppressing Protest).

of kettling peaceful protesters without giving them a chance to disperse.  Both de Blasio and Shea have publicly defended the NYPD's kettling tactics at the 2020 Racial Justice Protests.[15]

141.    Commissioner Shea, for example, has publicly endorsed the way the NYPD kettles protesters, acknowledging that the NYPD "had a plan, which was executed nearly flawlessly in the Bronx" during a protest in Mott Haven on June 4, 2020 (the "June 4 protest"). At the June 4 protest, the NYPD kettled protesters prior to the 8:00 PM curfew imposed by the City, leaving them no means to leave the protest, ordered them to leave without letting them leave, and then arrested the trapped protestors after the curfew expired.[16]  Commissioner Shea was "personally involved" in the Department's response to the protests including the May 29, 2020 Barclays Center protest at which police brutalized Plaintiffs.[17]

142.    Similarly, Mayor de Blasio confirmed he "approved the broad strategies and sometimes very specific choices" when asked whether he "approve[d] the tactics that . . . the NYPD [was] using  . . . on June 3rd and June 4th."[18]

143.    Retired Chief Monahan himself participated in and supervised the kettling of protesters without permitting them to disperse at the June 4 protest.  Chief Monahan has stated

---

[15]    Ali Watkins, *'Kettling' of Peaceful Protesters Shows Aggressive Shift by N.Y. Police*, N.Y. TIMES (June 5, 2020), https://www.nytimes.com/2020/06/05/nyregion/police-kettling-protests-nyc.html.

[16]    Melissa Chan, *'It Was a Purposeful Trap.' NYPD Planned Attack and Mass Arrests of Protesters, Human Rights Group Says*, TIME (Sept. 30, 2020 11:00 AM EDT), https://time.com/5894316/nypd-assault-arrest-protesters-report/; *see also* New York State Office of the Attorney General, PRELIMINARY REPORT ON THE NEW YORK CITY POLICE DEPARTMENT'S RESPONSE TO DEMONSTRATIONS FOLLOWING THE DEATH OF GEORGE FLOYD 32 (July 2020) (hereinafter NY AG Report) ("Commissioner Shea testified that he had never heard of the term kettling until after the protests began, but that in certain instances, kettling of protesters would be appropriate. Commissioner Shea did not specifically address whether the kettling described by witnesses at the hearing was appropriate or justified.").

[17]    *Transcript of NYPD Commissioner Dermot Shea,* DEP'T OF INVESTIGATIONS (May 10, 2021) https://www1.nyc.gov/assets/doi/oignypd/response/Commissioner_DermotShea.pdf.

[18]    *Transcript: Mayor de Blasio Holds Media Availability*, OFF. OF THE MAYOR (June 7, 2020), https://www1.nyc.gov/office-of-the-mayor/news/413-20/transcript-mayor-de-blasio-holds-media-availability

that he was "personally involved in the oversight of [the] protests . . . from the beginning," and that he was "making the decisions on the street.  No one was interfering[.]"[19]

144.    Upon information and belief, the NYPD officers initiated the kettling tactic at Chief Monahan's direction at the June 4 protest.[20]

### ii.    The City's practice of kettling protesters without permitting them an opportunity to disperse is a persistent and widespread custom with the force of law.

145.    Not only have the City's policymakers—namely de Blasio, Shea, and Monahan—publicly endorsed the NYPD's methods of kettling protesters, but the NYPD's repeated use of kettling at protests, without permitting demonstrators adequate opportunities to disperse—from as early as 2003 through the Occupy Wall Street Protests in 2011-2012, and continuing to the present—also further confirms that such kettling tactics amount to a persistent and widespread custom with the force of law within the Department.  For example:

   a.  In 2003, NYPD employed kettling-type tactics at an anti-war protest, including the use of barricades to confine protesters, making it impossible for them to disperse, and herding protesters into pens, resulting in excessive force and mass arrests.[21]  In addition to forming "pens" for protesters, the NYPD also used barricades "at the back of the crowd, thereby trapping the crowd on the block."[22]

   b.  At protests against the 2004 Republican National Convention, the NYPD used similar trap-and-detain tactics, using orange mesh netting to surround groups and indiscriminately arrest those inside.[23]

---

[19]  *Transcript of Chief of Department Terence Monahan,* DEP'T OF INVESTIGATIONS (May 10, 2021)
       https://www1.nyc.gov/assets/doi/oignypd/response/ChiefofDepartment_TerenceMonahan.pdf
[20]  *Id.*
[21]  N.Y. Civil Liberties Union, ARRESTING PROTEST 13, 19 (2003),
       https://www.nyclu.org/sites/default/files/nyclu_arresting_protest.pdf.
[22]  *Stauber v. City of New York*, No. 03 Civ. 9162, 2004 WL 1593870, at *5 (S.D.N.Y. July 16, 2004) (findings of
       fact about February 2003 United for Peace and Justice protest); *see id.* at *33 ("The plaintiffs' claim for
       injunctive relief with respect to the access policy is granted, and the NYPD is enjoined from unreasonably
       restricting access to and participation in demonstrations through the use of pens.").
[23]  N.Y. Civil Liberties Union, Rights and Wrongs at the RNC 12-13 (2005),
       https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf.; *see also* James J.
       Knicely & John W. Whitehead, *The Caging of Free Speech in America*, 14 TEMP. POL. & CIV. RTS. L. REV.
       455, 465–66 (2005) ("At the 2004 Republican National Convention in New York City, the NYPD attempted

      c.   In response to the 2011 and 2012 Occupy Wall Street Protests, the NYPD repeatedly used orange netting, scooters, and rows of officers to kettle protesters.[24]  These abusive practices led to lawsuits challenging, among other things, the NYPD's kettling tactics.[25]

146.    Implementation of these kettling tactics, on their face, requires coordinated, collective action by police officers.  It cannot arise spontaneously nor occur by chance.  Such coordinated, collective action can occur only when individual officers are all acting pursuant to the same policy, practice, or custom.  And the NYPD executed its policy of kettling peaceful protesters, without permitting them an opportunity to disperse, repeatedly at the 2020 Racial Justice Protests—including at the May 29 protest Senator Myrie and Assemblywoman Richardson attended, as well as subsequent 2020 protests—further confirming that the tactic is a widespread and persistent custom of the Department:

      a.   On May 28, 2020, protesters marched from Union Square Park down Lafayette Street toward City Hall.  Approximately 100 demonstrators were met in front of the Tweed Courthouse in lower Manhattan by NYPD officers who kettled the marchers, trapping them between the façade of the courthouse

---

other means of confining protests, including the use of orange 'netting' and what the *New York Times* reported as 'a preemptive strike policy, cutting off demonstrations before they grow large enough, loud enough, or unruly enough to affect the convention.'"); *id.* at 467 ("[T]he use of security zones, barricades, pens, netting, and no-tolerance/preemptive arrests to confine protests and clear the streets are the types of law enforcement tactics that have become routine at many events in the immediate pre- and post-9/11 era."); *MacNamara v. City of New York*, 275 F.R.D. 125, 133 (S.D.N.Y. 2011) ("The alleged policy involved, inter alia, the use of mesh netting or lines of police officers to corral large groups of protesters or perceived protesters; failure to distinguish bystanders, media personnel, and legal observers from the corralled groups prior to effecting arrests; failure to give dispersal orders that were audible to prospective arrestees; and failure to provide a reasonable opportunity to disperse.").

[24]  *See* Suppressing Protest at 110; *Garcia v. Doe*s, 779 F.3d 84, 89 (2d Cir. 2015) ("Officers blocked movement in both directions along the Bridge roadway and 'prevented dispersal through the use of orange netting and police vehicles.'  The officers then methodically arrested over seven hundred people who were on the Bridge roadway.").

[25]  *See Garcia*, 779 F.3d at 89; *Pluma v. City of New York*, No. 13 Civ. 2017, 2015 WL 1623828, at *10 (S.D.N.Y. Mar. 31, 2015) (allegations of "trap-and-detain" tactics); *Dekuyper v. City of New York*, No. 14 Civ. 8249, 2016 WL 7335662, at *1 (S.D.N.Y. Dec. 16, 2016) (allegations that "[w]hen the protesters arrived in Times Square, NYPD officers had erected barricades in the vicinity of Seventh Avenue, which resulted in the protesters being 'cordoned in,' at which time the protesters walked into the street"); *Marlin v. City of New York*, No. 15 Civ. 2235, 2016 WL 4939371, at *2 (S.D.N.Y. Sept. 7, 2016) (describing how "police officers formed a crowd, . . . and began pushing the protesters, a group of 50 to 100 people. . . . [as] [t]he crowd of protesters moved back slowly in response to being pushed by the officers," and evaluating "allegations that the NYPD used formations and police lines to physically push protesters, used 'force-related' policies and procedures for crowd control").

and a line of officers who created a barricade with their bicycles, leaving "no means for the protesters to disperse."[26]

b. On May 31, 2020, police kettled protesters at a demonstration in Manhattan near Canal and Church Streets.[27]

c. On June 2, 2020, police kettled protesters at a rally at Stonewall Inn on Christopher Street in Manhattan.[28]

d. On June 3, 2020, the NYPD kettled over 1,000 peaceful protesters, trapping them on the Manhattan Bridge for approximately two hours without permitting them to disperse.[29]  That same day, the NYPD employed kettling tactics at Cadman Plaza and in Midtown Manhattan.[30]

e. On June 4, 2020, the NYPD SRG kettled several hundred protesters in Mott Haven, Bronx, trapping them without any "way . . . to leave or disperse," and ultimately leading to the use of excessive force and arrests.[31]  Chief Monahan was present and observed the kettling of protesters in Mott Haven.[32]  The NYPD also kettled hundreds of protesters onto Washington Avenue in Fort Greene, Brooklyn that same day.[33]  Protesters were also kettled near Penn and Wythe Avenues in South Williamsburg on June 4, 2020.[34]

f. On June 5, 2020, at around 8:30 p.m., the NYPD kettled a group of several hundred protesters on the Upper West Side of Manhattan.[35]  Similar kettling

---

[26]  NY AG Report at 9.

[27]  *Submitted Written Testimony*, OAG HEARING ON INTERACTIONS BETWEEN NYPD AND THE GENERAL PUBLIC 130-31, https://ag.ny.gov/sites/default/files/2020-06-oag-nypd-writtentestimony.pdf (hereinafter NY AG Written Testimony).

[28]  *Id.* at 22.

[29]  *Id.* at 10, 71, 118; Matt Troutman, *NYPD Traps Peaceful George Floyd Protesters on Manhattan Bridge*, PATCH.COM (June 3, 2020 11:12 AM), https://patch.com/new-york/parkslope/nypd-traps-peaceful-george-floyd-protesters-manhattan-bridge.

[30]  Watkins, *supra* note 15; NY AG Written Testimony at 84.

[31]  *See, e.g.*, NY AG Report at 28; NY AG Written Testimony at 3, 4, 79, 123; *see also id.* at 139 (testimony on Racial Justice and Community Justice Units of Legal Aid Society; *id.* at 159 (Written Testimony of the Bronx Defenders); *id.* at 196 (written testimony of NYCLU; *id.* at 139 (testimony on Racial Justice and Community Justice Units of Legal Aid Society; *id.* at 159 (Written Testimony of the Bronx Defenders); *id.* at 196 (written testimony of NYCLU); Jen Kirby, *The "kettling" of protesters, explained*, VOX (June 6, 2020 5:30 pm EDT), https://www.vox.com/2020/6/6/21282509/george-floyd-protests-kettling-new-york-nypd.

[32]  Greg B. Smith, *Top NYPD Curfew Cop Faulted for Mass Arrest Tactics During 2004 GOP Convention*, THE CITY (June 5, 2020), https://www.thecity.nyc/2020/6/5/21282199/top-nypd-curfew-cop-faulted-for-mass-arrest-tactics-during-2004-gop-convention.

[33]  Christopher Robbins et al., *Live Protest Updates: Brooklyn Protests End with Dozens of Arrests in Crown Heights*, GOTHAMIST (June 5, 2020 11:30 PM), https://gothamist.com/news/live-protest-updates-june-5-2020. NY AG Written Testimony at 57.

[34]  NY AG Written Testimony at 100, 102, 112.

[35]  Robbins et al., *supra* note 33.

tactics were deployed against protesters in Crown Heights, Brooklyn near Nostrand Avenue that same night.[36]

g. On September 19, 2020, NYPD SRG officers kettled dozens of marchers and cyclists during protests responding to a whistleblower claim that Latinx women in ICE custody were involuntarily receiving hysterectomies.[37]

h. On November 4, 2020, police officers kettled demonstrators in the West Village in Manhattan.[38]

i. On January 18, 2021, police officers kettled protesters at City Hall Park, without permitting them sufficient opportunity to disperse.[39]

### iii.    The City has failed to train NYPD officers to prevent them from kettling peaceful protesters without giving them an opportunity to disperse.

147.    After conducting an independent investigation into the NYPD's response to the 2020 Racial Justice Protests following George Floyd and Breonna Taylor's murders, the DOI concluded that the "NYPD's use of force and certain crowd control tactics," including "encirclement (commonly called 'kettling')"—in response to the protests "produced excessive enforcement that contributed to heightened tensions" and "reflected a failure to calibrate an appropriate balance between valid public safety or officer safety interests and the rights of protesters to assemble and express their views."[40]

148.    On December 18, 2020, Mayor de Blasio posted a video statement responding to the DOI report, expressing his "agree[ment] with its analysis . . . and recommendations."[41]  The

---

[36]    *Id.*

[37]    Ali Winston, *Meet the NYPD's Bike-Mounted 'Goon Squad*, STREETSBLOG NYC (Oct. 16, 2020), https://nyc.streetsblog.org/2020/10/16/meet-the-nypds-bike-mounted-goon-squad/.

[38]    Ed Shanahan, *Police 'Kettle' Protesters in Manhattan, Arresting Dozens*, N.Y. TIMES (Nov. 4, 2020), https://www.nytimes.com/2020/11/04/nyregion/nyc-presidential-election-protests.html.

[39]    *See* Ellen Moynihan & John Annese, *More than 30 arrested when demonstrators, NYPD clash at City Hall Park*, N.Y. DAILY NEWS (Jan. 18, 2021), https://www.nydailynews.com/new-york/nyc-crime/ny-protest-city-hall-park-20210119-d2lkchbnxbhtbie5xqvfktyhiu-story.html.

[40]    New York City Dep't of Investigation, INVESTIGATION INTO NYPD RESPONSE TO THE GEORGE FLOYD PROTESTS (Dec. 2020) (hereinafter NYC DOI Report), https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf.

[41]    *Mayor de Blasio Releases Video Supporting DOI Investigation of NYPD Protest Response*, OFF. OF THE MAYOR (Dec. 18, 2020), https://www1.nyc.gov/office-of-the-mayor/news/870-20/mayor-de-blasio-releases-video-supporting-doi-investigation-nypd-protest-response.

Mayor further noted that "[the City] needs a different approach, a different strategy, a different way of communicating right there on the spot when there is a protest,"[42] and that "there were choices made, strategic choices, that weren't good choices it turns out; that ended up causing problems. . . . And I know this gives us a roadmap for what we have to do better in the future . . . Commissioner Shea agrees.  We accept the recommendations of the [DOI] and we are going to implement them right away."[43]

149.    Based on the NYPD's history of kettling—and the unconstitutional consequences that have ensued from its deployment—prior to the 2020 Racial Justice Protests, it was conspicuously obvious that NYPD officers who engaged in kettling tactics were likely to violate the constitutional rights of protesters to be free from excessive force and false arrests, especially where protesters were not permitted an opportunity to disperse.  From 2003 onward, NYPD officers' use of kettling at protests has resulted in a litany of civil rights complaints against the City for, among other things, excessive force and false arrest.  *See* ¶ 146 *supra* & nn. 23-24.[44] Similarly, since 2003, the NYPD's use of kettling, and its unconstitutional consequences, have been well-documented in public reports.[45]

150.    Accordingly, prior to the May 29 protest, the City knew or should have known that NYPD officers required further training, discipline, and/or supervision regarding the use of crowd control tactics at peaceful protests and more specifically, regarding how to avoid kettling protesters in a manner likely to lead to unconstitutionally excessive force and/or false arrests,

---

[42]    *Id.*
[43]    *Id.*
[44]    *Case v. City of New York*, 233 F. Supp. 3d 372, 405 (S.D.N.Y. 2017) (collecting "cases spanning the period from 2000 to 2012 that demonstrate "a pattern and practice of constitutional abuse" involving the use of mass arrest policies and practices").
[45]    *See* Suppressing Protest.

including by failing to give protesters opportunities to disperse.  As Mayor de Blasio put it, "we have to come to grips with that.  We have to train our police force differently."[46]

151.    But despite its awareness of the problem, the City has long failed to adequately train and/or supervise its officers regarding the unconstitutional consequences of kettling protesters.  Indeed, between the 2004 RNC protests and the recent 2020 Racial Justice Protests, "NYPD records do not show any protest-related after action reviews [were] undertaken."[47]

152.    After the 2020 Racial Justice Protests, a review by the Corporation Counsel for the City of New York concluded that the "NYPD does not have a regular practice or policy of conducting and documenting rigorous, macro-level self-assessments regarding the policing of protests.  Consistent with this, NYPD officials advised that, when planning the response to [last] summer's protests, they did not review prior after-action reports," nor did the NYPD "incorporate[] outside reports and recommendations into the evaluation and development of its protest policing policies and practices."[48]  And, as Corporation Counsel ultimately concluded, even "for those officers who do receive specialized training regarding protests and crowds, the training does not sufficiently provide officers with instruction around crowd psychology, de-escalation, and First Amendment issues."[49]

153.    At the 2020 Racial Justice Protests, NYPD deployed "a significant number of officers" who "lacked recent training related to policing protests"[50]—indeed, for most of the officers deployed to the 2020 Racial Justice Protests, "their training on policing protests was

---

[46]   *Mayor de Blasio Releases Video Supporting DOI Investigation of NYPD Protest Response*, OFF. OF THE MAYOR (Dec. 18, 2020), https://www1.nyc.gov/office-of-the-mayor/news/870-20/mayor-de-blasio-releases-video-supporting-doi-investigation-nypd-protest-response.

[47]   Corporation Counsel Report Pursuant to Executive Order 58 Directing an Analysis of Factors Impacting te George Floyd Protests in New York City, NYC L. DEP'T 30 (Dec. 2020) (hereinafter Corp. Counsel Report).

[48]   *Id.* at 32-33.

[49]   *Id.* at 2.

[50]   NYC DOI Report at 56.

limited to what they had received as recruits in the Academy."[51]  This is because, before the

2020 protests, "the NYPD offered no comprehensive in-service training across the Department

that related to policing protests at all."[52]

154.    The NYPD's widespread misuse of kettling from May through at least November

of 2020, including on May 29, 2020, reflects a deliberate indifference towards the need for

further training, supervision, and/or discipline of NYPD officers as to appropriate crowd control

methods and the use of kettling.

155.    In short, the City Defendants knew that NYPD officers would be faced with

peaceful protesters, and they were aware that, in the past, the NYPD had deployed kettling in a

manner that led to unconstitutionally excessive force and false arrests, including by failing to

permit an adequate opportunity to disperse.  Nevertheless, Defendants failed to implement any

training, supervision, and/or discipline relating to crowd control tactics at protests—or, more

specifically, the appropriate tactical use of kettling—between 2003 and 2020.  Predictably, this

led NYPD officers to employ kettling tactics in a way that violated Senator Myrie and

Assemblywoman Richardson's constitutional rights, as well as the rights of countless other

protesters.

### *The City has a policy, practice, or custom of using bicycles as weapons against peaceful protesters.*

156.    The NYPD has a widespread policy, practice, and/or custom of using bicycles as

weapons against peaceful protesters, leading to the use of unreasonably excessive force.  At the

2020 Racial Justice Protests, NYPD officers re-purposed their bicycles as bludgeons, riot shields,

---

[51]    Corp. Counsel Report at 37.
[52]    NYC DOI Report at 61.

and barricades,[53] which they used against peaceful demonstrators in a manner likely to result in unconstitutionally excessive force.  Unlike a tactical baton or asp, bicycles are not designed to be used as instruments of physical force.  Bicycles cannot appropriately be deployed as tools to effectuate the minimal force reasonably necessary to police a peaceful protest.[54]  In other words, the use of bicycles as weapons to control crowds at protests is virtually certain to lead to the use of excessive force.

157.    At the May 29 protest, NYPD officers lined up in a row, in synchronized fashion, wielding their bicycles as weaponized barriers.  The officers proceeded to assault Senator Myrie and Assemblywoman Richardson, as well as other protesters nearby, with their bicycles, pushing them and battering them without notice or cause.

> ### i.   City officials with policymaking authority have endorsed the use of bicycles as weapons against peaceful protesters.

158.    Commissioner Shea is a municipal official with policymaking authority. Commissioner Shea has confirmed that the bicycle formations NYPD officers used at the 2020 Racial Justice Protests, including officers' use of bikes for crowd control purposes, were "choreographed and part of the training they go through."[55]

159.    Mayor de Blasio approved the broad strategy and specific choices about the tactics the NYPD used at the 2020 Racial Justice Protests, and former Chief Monahan was

---

[53]   *See* Dean Meminger, *NYPD Bike Cops Accused of Being Too Aggressive at Protests*, SPECTRUM NEWS NY1 (Nov. 18, 2020, 8:00 AM), https://www.ny1.com/nyc/all-boroughs/news/2020/11/18/nypd-bike-cops-accused-of-being-too-aggressive-at-protests ("Officers have used their bikes as shields and barriers for crowd control").

[54]   Julianne Cuba, *Trek Bicycles Declines to Divest from NYPD Despite 'Abhorrent' Use of Bikes Against Protesters*, STREETSBLOG NYC (June 10, 2020), https://nyc.streetsblog.org/2020/06/10/trek-bicycles-declines-to-divest-from-nypd-despite-abhorrent-use-of-bikes-against-protesters/ (Trek Bikes admitted in a statement issued to Streetsblog on Tuesday that its bikes were being used by police "in ways that are abhorrent and vastly different from their intended use."); Andrew J. Hawkins, *Bikes Can Be a Tool for Protest – And Police Brutality*, THE VERGE (June 12, 2020 2:04 PM), https://www.theverge.com/2020/6/12/21284263/bicycle-police-brutality-protest-black-lives-matter-trek-fuji ("'We have seen instances in the last week where police have used bicycles in violent tactics, which we did not intend or design our bicycles for,' the company said in a statement.").

[55]   Meminger, *supra* note 53.

personally involved from the beginning of the protests in making strategic decisions about the police response on the streets.  *See* ¶¶ 143-44, *supra.*

160.    The NYPD's weaponization of bicycles as barricades and bludgeons reflects coordinated, synchronized action that could be effectuated only if undertaken pursuant to a common policy, practice, and/or custom of the Department.

> ### ii.   The City's practice of using bicycles as weapons against peaceful protesters is a persistent and widespread custom with the force of law.

161.    NYPD officers repeatedly used their bicycles as weapons to batter peaceful protestors throughout the 2020 Racial Justice Protests, including at the following protests:

a.    On May 28, 2020, at a protest in Union Square, police officers formed a barricade with their bicycles across from thirty to forty protesters gathered along Broadway.  When one protester stepped off the curb, three NYPD officers rammed their bicycles into the protesters.[56]  After the demonstrators at Union Square dispersed, and some began to march down Lafayette Street towards City Hall, NYPD officers "kettled in" the marchers in front of the Tweed Courthouse, "creati[ng] a barricade with their bicycles."[57]

b.    On June 4, 2020, at a protest in Mott Haven, NYPD officers again used their bicycles to block the path of a group of peaceful protesters.[58]  Bicycle police donning riot gear kettled the protesters in, using their bicycles to push the protesters together from the front and from behind the crowd.[59]  Chief of Department Monahan was present and observed the officers' use of bicycles as weapons in Mott Haven.[60]  Members of the SRG Bicycle Unit in particular used their bicycles as weapons to push protesters prior to making arrests.[61]

c.    On November 4 and 5, 2020, following the 2020 presidential election, protesters again gathered across New York City.  On November 5, 2020, at a demonstration in lower Manhattan, NYPD officers weaponized their bicycles to ram protesters, including Public Advocate Jumaane Williams.[62]

---

[56]   Cuba, *supra* note 54
[57]   NY AG Report at 9.
[58]   NY AG Report at 17.
[59]   HUMAN RIGHTS WATCH, "KETTLING" PROTESTERS IN THE BRONX SYSTEMIC POLICE BRUTALITY AND ITS COSTS IN THE UNITED STATES (Sept. 30, 2020), https://www.hrw.org/report/2020/09/30/kettling-protesters-bronx/systemic-police-brutality-and-its-costs-united-states; NY AG Report at 17.
[60]   Smith, *supra* note 32.
[61]   NY AG Report at 28.
[62]   Julianne Cuba, *Pols to Mayor: Cops are Weaponizing Bikes. End this Now.*, STREETS BLOG NYC (Nov. 9, 2020), https://nyc.streetsblog.org/2020/11/09/pols-to-mayor-cops-are-weaponizing-bikes-end-this-now/.

### iii.   The City has failed to train NYPD officers to prevent them from using their bicycles as weapons against peaceful protesters.

162.    De Blasio, Shea, Monahan, and the City knew or should have known that NYPD officers—especially SRG officers—would weaponize their bicycles as barricades, riot shields, and/or bludgeons, unless the City implemented further training, supervision, and/or discipline. Indeed, the use of bicycles as weapons was presaged by the frequent use of scooters as weapons during the Occupy Wall Street protests in 2011 and 2012.[63]  Yet Defendants acted with deliberate indifference to this likelihood of constitutional abuse, failing to implement any trainings, supervision, and/or discipline relating to the impermissibility of police officers weaponizing their bicycles to batter peaceful protesters.

163.    Before the 2020 Racial Justice Protests in May and June of last year, the NYPD had not undertaken large-scale protest training since the 1990s.  Most of the officers deployed to the 2020 Racial Justice Protests had not received training on policing protests since their training as recruits in the police academy.[64]  And, as the Corporation Counsel concluded, even "for those officers who do receive specialized training regarding protests and crowds, the training does not sufficiently provide officers with instruction around crowd psychology, de-escalation, and First Amendment issues."[65]  Accordingly, the NYPD deployed "a significant number of officers" who "lacked recent training related to policing protests."[66]

---

[63]  Suppressing Protest at 78 ("[P]olice have also used scooters, at times dangerously, as a direct contact crowd dispersal tool, and driven either recklessly or intentionally at and into protesters' bodies" (emphasis omitted)); *see also id.*, App'x I, Rows 24, 29, 67, 97, 124.
[64]  *See* Corp. Counsel Report at 37.
[65]  Corp. Counsel Report at 2.
[66]  NYC DOI Report at 56.

164.    In July 2020, after those protests, the NYPD undertook to train officers on how to respond to large-scale protests. [67]  Still, upon information and belief, that training did not address the impermissibility of using bicycles as weapons to batter peaceful demonstrators.

165.    SRG officers in particular are known for using "military-style training to break up crowds."[68]  SRG was created in 2015 as a "specialized unit dedicated to disorder control and counterterrorism."[69]  Despite internal debate at the NYPD upon creating SRG as to the propriety of deploying SRG to respond to First Amendment activities like protests, "SRG has since been a primary resource for the NYPD's response to large-scale protests."[70]

166.    Upon information and belief, SRG officers are not adequately trained, supervised, and/or disciplined to prevent their use of bicycles as weapons against peaceful demonstrators. SRG officers were among those who used bicycles as weapons at the May 29 protest at Barclays Center.[71]

167.    The City Defendants' failure to train, supervise, and/or discipline NYPD officers to refrain from weaponizing bicycles against peaceful protestors after the 2020 Racial Justice Protests is apparent from the repetition of similar abuses at the November 2020 post-election protests.[72]

168.    As a result of the City's policy, practice, and/or custom of using bicycles as weapons against peaceful protestors, Senator Myrie and Assemblywoman Richardson (among

---

[67]   Ben Chapman and Emma Tucker, *NYPD Prepares for Potential Unrest After Presidential Election*, WALL ST. J. (Oct. 5, 2020), https://www.wsj.com/articles/nypd-prepares-for-potential-unrest-after-presidential-election-11601902231.
[68]   Winston, *supra* note 37.
[69]   NYC DOI Report at 35.
[70]   *Id.*
[71]   *Id.* at 32.
[72]   *See* Cuba, *supra* note 54.

others), were subjected to unconstitutionally excessive force in violation of their constitutional rights when officers pushed, beat, and battered them with bicycles.

### The City has a policy, practice, or custom of arresting peaceful protestors without probable cause.

169.    At the 2020 Racial Justice Protests, NYPD officers arrested protesters, including Senator Myrie, without probable cause.

#### i.    The City's practice of arresting peaceful protesters without probable cause is a persistent and widespread custom with the force of law.

170.    The NYPD has an enduring history of effecting unlawful detentions of peaceful protesters without probable cause over the past two decades, as reflected in the litany of lawsuits against the City alleging false arrests of protestors.[73]

171.    In responding to the 2020 Racial Justice Protests, NYPD continued this pattern of unlawfully arresting protesters without probable cause.[74]

172.    The NYPD's actions at the 2020 Racial Justice Protests, in conjunction with its longstanding history of effecting unlawful arrests at peaceful protests, confirm that the City has a

---

[73]    *See, e.g.*, *Lynch v. City of New York*, 952 F.3d 67, 76-77 (2d Cir. 2020) (reversing motion to dismiss Black Lives Matter protester's false arrest claim); *Landers v. City of New York*, No. 16 Civ. 5176, 2019 WL 1317382, at *5 (E.D.N.Y. Mar. 22, 2019) (denying defendants motion for summary judgment on false arrest claim by Black Lives Matter protester); *Case v. City of New York*, 233 F. Supp. 3d 372, 406-08 (S.D.N.Y. 2017) (denying motion to dismiss Occupy Wall Street protester's claim that the City has a "policy and practice of treating perceived 'groups' of people as a 'unit' for 'mass arrest' probable cause determination purposes without ensuring that lawfully authorized and constitutionally significant notice, and a meaningful opportunity to disperse, were given and disregarded prior to treating the perceived 'group' as a 'unit'"); *Gersbacher v. City of New York*, 134 F. Supp. 3d 711, 722 (S.D.N.Y. 2015); *Higginbotham v. City of New York*, 105 F. Supp. 3d 369, 375 (S.D.N.Y. 2015) (Occupy Wall Street Protester plausibly alleged false arrest claim); *Dinler v. City of New York*, No. 04 Civ. 7921, 2012 WL 4513352, at *12 (S.D.N.Y. Sept. 30, 2012) (granting protester's motion for summary judgment on false arrest claim arising out of 2004 RNC protest); *Osterhoudt v. City of New York*, No. 10 Civ. 3173L, 2012 WL 4481927, at *2 (E.D.N.Y. Sept. 27, 2012); *see also Zellner v. Summerlin*, 494 F.3d 344, 378 (2d Cir. 2007) (reinstating jury verdict in favor of plaintiff-protester on false arrest claim).

[74]    NYAG Written Testimony at 8 ("Over the course of the protests I witnessed police gleefully beating and arresting peaceful, unarmed, protestors for no reason as they tried to peacefully disperse."); *id.* at 9 ("When we asked why we were being arrested, one officer literally said 'hmm, I don't know'! (We were never given an order to disperse, nor given a reasonable opportunity to comply).").

widespread and persistent policy, practice, and/or custom, with the force of law, of unlawfully arresting protesters without individualized probable cause.

### ii. The City has failed to train NYPD officers to prevent them from arresting peaceful protesters without probable cause.

173.    Since at least 2012, based on NYPD's conduct at the Occupy Wall Street Protests and the resulting civil rights complaints and litigations, Defendants have been on notice that further training, supervision, and/or discipline were required to ensure police did not unlawfully arrest and/or detain protesters without probable cause.

174.    Despite their awareness of the NYPD's history of unconstitutionally arresting protesters without probable cause since at least the Occupy Wall Street Protests in 2011 and 2012 (and the RNC and antiwar protests of the early aughts), as reflected in lawsuits and public reports, the City Defendants have failed to institute adequate training, supervision, and/or discipline to ameliorate the problem.

175.    Before the 2020 protests, the NYPD had not undertaken large-scale protest training since the 1990s and offered no comprehensive protest-related training.  And for those officers that it did train, the NYPD provided inadequate training around crowd psychology, de-escalation, and First Amendment issues.  *See* ¶¶ 163-164, *supra*.

176.    Accordingly, the NYPD deployed "a significant number of officers" who "lacked recent training related to policing protests."[75]

177.    And even after the 2020 Racial Justice Protests, when Commissioner Shea did "deci[de] to expand training relating to protests," that training focused solely or primarily on

---

[75]    NYC DOI Report at 56.

crowd control tactics and formations with no discernable reference to managing interactions, facilitating First Amendment rights, or minimizing the use of force."[76]

178.    This failure to train, supervise, or discipline resulted in a policy, practice, or custom of arresting protesters without probable cause.

179.    Pursuant to the City's policy, practice or custom of arresting protesters without probable cause, Senator Myrie was falsely arrested in violation of his Fourth Amendment rights.

***The City has a policy, practice, or custom of chilling protected speech, particularly speech on police brutality and racial injustice.***

>    i.    ***The City's practice of chilling protected speech on police brutality and racial injustice is a persistent and widespread custom with the force of law****.*

180.    The NYPD has a longstanding history of effecting false arrests for engaging in protected First Amendment activity and otherwise retaliating against speech it perceives as critical of police.  As documented in dozens of prior litigations, in the ten-year period leading up to the 2011 Occupy Wall Street protests, the NYPD engaged in policies, practices, and customs that led to false arrests of protesters for engaging in First Amendment activities.[77]

181.    Upon information and belief, the NYPD is even more likely to act to deter speech when officers perceive it as hostile to the NYPD's interests specifically, such as the 2020 Racial

---

[76]    NYC DOI Report at 61-62.

[77]    *Case v. City of New York*, 233 F. Supp. 3d 372, 407-08 (S.D.N.Y. 2017) ("Plaintiffs claim that these specific practices were similarly applied in other cases, spanning the 10–year period leading up to the November 17, 2011 demonstration, to falsely arrest protestors for engaging in First Amendment activity. . . . Based on the dozens of lawsuits and decade of litigation over these incidents, Plaintiffs plausibly allege that the City knew or should have known that these policies and practices led to unconstitutional results."); *MacNamara v. City of New York*, 275 F.R.D. 125, 154 (S.D.N.Y. 2011) (certifying classes challenging mass arrests at 2004 RNC effected in retaliation for exercise of First Amendment protest rights); *Garcia v. Bloomberg*, 865 F. Supp. 2d 478, 490 (S.D.N.Y. 2012), *aff'd sub nom. Garcia v. Does*, 764 F.3d 170 (2d Cir. 2014), *on reh'g*, 779 F.3d 84 (2d Cir. 2015), and *rev'd on other grounds sub nom. Garcia v. Does*, 779 F.3d 84 (2d Cir. 2015) (denying motion to dismiss allegations that "that the officers did not give fair warning to the overwhelming majority of the 700 demonstrators who were arrested in this case" in violation of, *inter alia*, First Amendment rights of Occupy Wall Street protesters); *Packard v. City of New York*, No. 15 Civ. 7130, 2017 WL 11580887, at *9 (S.D.N.Y. Mar. 2, 2017), *on reconsideration in part*, 2017 WL 11580855 (S.D.N.Y. July 17, 2017) ("Plaintiffs plausibly allege that the City knew or should have known that the failure to train the NYPD in First Amendment principles would lead to unconstitutional results, and, therefore, have sufficiently pleaded the City's deliberate indifference.").

Justice protesters' excoriation of the nationwide police brutality and injustice towards Black

people.  At other recent mass demonstrations relating to topics *other than* police brutality and

racial injustice (e.g., the 2018 March for Our Lives, 2019 Climate Strike NYC, and the 2020

Women's March), protesters were not met with the same unconstitutional and retaliatory police

response.

182.     As part of this policy, practice, or custom, the NYPD has a policy of issuing

vague, pre-recorded directions to disperse, even where there is no legitimate reason to end lawful

and peaceful protests, which is insufficient to give a reasonable protester notice of how they are

expected to disperse, where they are supposed to go, and how far from the site of the protest they

must move to comply.

183.     For example, at the May 29 protest attended by Senator Myrie and

Assemblywoman Richardson, the NYPD played a prerecorded message directing protestors to

disperse.  But, NYPD officers did not permit protesters sufficient time, or adequate avenues of

egress from the site of the protest, to comply with the order; instead, they moved immediately

towards the use of force and/or arrests in retaliation against protesters' protected speech and

expressive conduct.[78]

184.     The NYPD's repeated actions to deter protected speech on the topic of police

brutality and racial injustice at the May and June 2020 protests, *see* ¶¶ 146(a-i); 161(a-c), *supra*,

confirm that the Department has a widespread and persistent policy, practice, and/or custom,

with the force of law, of chilling protected speech on police brutality and racial injustice.[79]

---

[78]  *Cf.* NYC DOI Report at 69 ("NYPD should play any LRAD dispersal orders or warnings at least three times from multiple locations at large protests and events, unless emergency circumstances do not permit.").

[79]  NYC DOI Report at 68 ("[T]he scope and nature of the Floyd protests posed several challenges to NYPD's ability to respond, raised questions about the legitimacy of that response, and revealed some shortcomings in the NYPD's approach and preparedness for policing First Amendment- protected protest activity."); *id.* at 30 ("The Department itself made a number of key errors or omissions that likely escalated

###### ii. The City has failed to train NYPD officers to prevent them from chilling protected speech, particularly speech on police brutality and racial injustice.

185.    Since at least 2012, Defendants have been on notice that further training, supervision, and/or discipline were required to ensure police did not retaliate against protestors to deter speech, particularly speech concerning police brutality and racial justice:

> The Suppressing Protest Report details many instances of NYPD officers arresting individuals for engaging in or documenting expressive speech prior to September 2012.  These allegations are sufficient for the Court to plausibly infer that the City was on notice of a history or pattern of false arrests due to insufficient training on First Amendment principles.[80]

186.    Despite their awareness of the NYPD's history of unconstitutionally acting to deter protected speech, as evidenced by lawsuits and public reports, the City Defendants have failed to institute adequate training, supervision, and/or discipline to ameliorate the problem since the Occupy Wall Street Protests in 2011 and 2012 (and the RNC and antiwar protests of the early aughts).

187.    Before the 2020 protests, the NYPD had not undertaken large-scale protest training since the 1990s and offered no comprehensive protest-related training.  And for those officers that it did train, the NYPD provided inadequate training around crowd psychology, de-escalation, and First Amendment issues.  *See* ¶ 164, *supra*.

188.    Accordingly, the NYPD deployed "a significant number of officers" who "lacked recent training related to policing protests."[81]

---

tensions, and certainly contributed to both the perception and the reality that the Department was suppressing rather than facilitating lawful First Amendment assembly and expression.").

[80]    *Packard v. City of New York*, No. 15 Civ. 7130, 2017 WL 11580887, at *8 (S.D.N.Y. Mar. 2, 2017), *on reconsideration in part*, 2017 WL 11580855 (S.D.N.Y. July 17, 2017).

[81]    NYC DOI Report at 56.

189.     And even after the 2020 Racial Justice Protests, when Commissioner Shea decided to expand protest related training, such training failed to adequately address or focus on facilitation of First Amendment Rights.  *See* ¶ 178, *supra*.

190.     As a result of the Defendants' inadequate training, supervision, and/or discipline, NYPD officers repeatedly deployed tactics to deter First Amendment-protected speech on the topic of police brutality and racial injustice at protests in 2020.  This failure to train, supervise, or discipline resulted in a policy, practice, or custom of deterring protected speech, which led directly to the Defendant-Officers' unconstitutional suppression of Senator Myrie and Assemblywoman Richardson's protected expression at the May 29 protest.

### The City's unconstitutional policies, practices, and/or customs were the moving force behind the violations of Senator Myrie and Assemblywoman Richardson's rights.

191.     At all times, the Defendant-Officers acted pursuant to the City of New York's unconstitutional policies, practice, and/or customs.  These policies, practices, and customs were the moving force behind the Defendant-Officers' violation of Plaintiffs' constitutional rights.

192.     The policies, practices, and/or customs that motivated the Defendant-Officers' actions, include but are not limited to: (a) "kettling," encircling, corralling, or otherwise "trapping and detaining" (collectively, "kettling") peaceful protesters en masse, without giving them a chance to leave, augmenting the risk of physical conflict; (b) using bicycles as weapons to bludgeon and batter peaceful protesters; (c) arresting peaceful protestors without probable cause; (d) chilling, preventing or otherwise deterring protesters from engaging in similarly protected speech in the future on the subject of police brutality and racial injustice; and (e) taking action against protesters pursuant to vague and ineffectual dispersal orders.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

42 U.S.C. § 1983 – Fourth Amendment/Fourteenth Amendment – Excessive Force

Against Defendant-Officers

193.    Plaintiffs repeat and reallege the preceding paragraphs as if set forth here.

194.    On May 29, 2020, Defendant-Officers used objectively unreasonable force against Plaintiffs, proximately causing injury.

195.    At all relevant times, Defendant-Officers were acting under color of state law.

196.    Defendants-Officers' conduct was willful, wanton, and reckless.

### SECOND CAUSE OF ACTION

42 U.S.C. § 1983 – Fourth Amendment – False Arrest

Against Defendant-Officers

197.    Plaintiffs repeat and reallege the preceding paragraphs as if set forth here.

198.    On May 29, 2020, Defendant-Officers, including Defendant Captain Joseph B. Taylor and Defendant Sergeant Giovanni Calderon, intentionally seized, detained, and arrested Senator Myrie in the absence of probable cause that he had engaged in unlawful conduct.

199.    Defendant-Officers' arrest of Senator Myrie was not authorized by a judicial warrant or any law or otherwise privileged.

200.    At all relevant times, Senator Myrie was conscious of his confinement and did not consent to confinement.

201.    Defendant-Officers' confinement of Senator Myrie proximately caused injury to him.

202.    At all relevant times, Defendant-Officers were acting under color of state law.

203.    Defendants-Officers' conduct was willful, wanton, and reckless.

## THIRD CAUSE OF ACTION

42 U.S.C. § 1983 – Fourth Amendment – Illegal Seizure

Against Defendants-Officers

204.    Plaintiffs repeat and reallege the preceding paragraphs as if set forth here.

205.    On May 29, 2020, Defendant-Officers, including Defendant Officer Jorge Perez and Defendant John Doe #1, deployed pepper spray against Plaintiffs, causing them to be temporarily incapacitated, unable to move, and to suffer severe pain.

206.    Plaintiffs were not engaged in unlawful conduct at the time Defendant-Officers pepper sprayed them, and the Defendant-Officers lacked the reasonable articulable suspicion of criminality required to effect a seizure.

207.    Defendants-Officers' use of pepper spray was objectively unreasonable and constituted an unlawful seizure under the Fourth Amendment.

208.    In addition, Defendant-Officers, including Defendant Captain Joseph B. Taylor and Defendant Sergeant Giovanni Calderon, handcuffed and arrested Senator Myrie.  Senator Myrie's arrest was made in the absence of probable cause that he was engaged in unlawful conduct.

209.    Senator Myrie's arrest was objectively unreasonable and constitutes an additional unlawful seizure under the Fourth Amendment.

210.    At all relevant times, Defendant-Officers were acting under color of state law.

211.    Defendants-Officers' conduct was willful, wanton, and reckless.

## FOURTH CAUSE OF ACTION

42 U.S.C. § 1983 – First Amendment – Free Speech

Against Defendant-Officers

212.    Plaintiffs repeat and reallege the preceding paragraphs as if set forth here.

213.    On May 29, 2020, Plaintiffs participated in a peaceful protest against police misconduct and racial injustice.

214.    Plaintiffs' participation in the protest on May 29, 2020 was protected speech under the First Amendment.

215.    On May 29, 2020, Defendant-Officers forcibly dispersed the peaceful protest. When the Defendant-Officers dispersed the protest, the Plaintiffs and protestors were behaving lawfully.  There was no violence nor threat of violence to the Defendant-Officers at the time they made Plaintiffs and the protestors disperse.

216.    Defendant-Officers did not give the Plaintiffs and protestors fair notice and an opportunity to leave the area before using force to disperse them.

217.    Defendant-Officers thereby prevented Plaintiffs from engaging in speech protected under the First Amendment and deterred them from engaging in similarly protected speech in the future.

218.    At all relevant times, Defendant-Officers were acting under color of state law.

219.    Defendants-Officers' conduct was willful, wanton, and reckless.

## FIFTH CAUSE OF ACTION

42 U.S.C. § 1983 – First Amendment – Retaliation

Against Defendant-Officers

220.    Plaintiffs repeat and reallege the preceding paragraphs as if set forth here.

221.    On May 29, 2020, Plaintiffs engaged in a peaceful protest—a protected First Amendment activity.

222.    During the peaceful protest, Plaintiffs questioned Defendant-Officers' inappropriate use of force against them and other protestors, another activity protected by the First Amendment.

223.    On May 29, 2020, motivated by and substantially caused by a desire to retaliate against Plaintiffs' protected activities, Defendant-Officers took adverse action against Plaintiffs, including by using excessive force against Plaintiffs and by falsely arresting Senator Myrie, causing physical and emotional injury.

224.    Defendant-Officers' retaliatory and adverse action chilled and deterred Plaintiffs from exercising the First Amendment rights.

225.    At all relevant times, Defendant-Officers were acting under color of state law.

226.    Defendants-Officers' conduct was willful, wanton, and reckless.

## SIXTH CAUSE OF ACTION

42 U.S.C. § 1983 – Fourth Amendment – Municipal Liability for Use of Excessive Force Against City Defendants

227.    Plaintiffs repeat and reallege the preceding paragraphs as if set forth here.

228.     The City Defendants have implemented, enforced, encouraged, sanctioned, and/or ratified policies, practices, and/or customs that lead to the use of unlawfully excessive force against peaceful protesters in violation of the Fourth Amendment.  The City's unconstitutional policies, practices, and/or customs, include but are not limited to: (a) "kettling," encircling, corralling, or otherwise "trapping and detaining" peaceful protesters en masse without permitting protestors to leave, augmenting the risk of physical conflict; and (b) using bicycles as weapons to batter peaceful protesters.

229.    That policy, custom, or usage was a moving force behind the violation of Plaintiffs' Fourth Amendment rights, and proximately caused Plaintiffs' injuries.

230.    Prior reports, lawsuits, and civil rights complaints have put City Defendants on notice, prior to the 2020 Racial Justice Protests, that NYPD officers were certain to confront

large scale protests, and that officers had displayed a pattern of unconstitutional conduct at past large-scale protests.

231.    City Defendants acted with deliberate indifference to the likely violation of New Yorkers' Fourth Amendment rights by failing to adequately train, supervise, and/or discipline NYPD officers to prevent such violations.

232.    Such violations are likely to recur at future large-scale protests in New York City.

233.    If City Defendants policies, practices, and/or customs of (a) "kettling," encircling, corralling, or otherwise "trapping and detaining" peaceful protesters en masse, without permitting protestors to leave, resulting in an augmented risk of physical conflict; and (b) using bicycles as weapons to batter protesters are not enjoined, New Yorkers will continue to suffer irreparable harm to their constitutional rights.

## SEVENTH CAUSE OF ACTION

42 U.S.C. § 1983 – Fourth Amendment – Municipal Liability for Unlawful Seizure

Against City Defendants

234.    Plaintiffs repeat and reallege the preceding paragraphs as if set forth here.

235.    The City Defendants have implemented, enforced, encouraged, sanctioned, and/or ratified policies, practices, and/or customs that lead to the unlawful arrest, detention, and/or seizure of peaceful protesters, without probable cause, in violation of the Fourth Amendment. The City's unconstitutional policies, practices, and/or customs, include but are not limited to: (a) "kettling," encircling, corralling, or otherwise "trapping and detaining" peaceful protesters en masse without permitting protestors to leave, augmenting the risk of physical conflict; and (b) arresting protesters without individualized probable cause.

236.    That policy, custom, or usage was a moving force behind the violation of Plaintiffs' Fourth Amendment rights, and proximately caused Plaintiffs' injuries.

237.    Prior reports, lawsuits, and civil rights complaints have put City Defendants on notice, prior to the 2020 Racial Justice Protests, that NYPD officers were certain to confront large scale protests, and that officers had displayed a pattern of unconstitutional conduct at past large-scale protests.

238.    City Defendants acted with deliberate indifference to the likely violation of New Yorkers' Fourth Amendment rights by failing to adequately train, supervise, and/or discipline NYPD officers to prevent such violations.

239.    Such violations are likely to recur at future large-scale protests in New York City.

240.    If City Defendants' policies, practices, and/or customs of (a) "kettling," encircling, corralling, or otherwise "trapping and detaining" peaceful protesters en masse without permitting protestors to leave, augmenting the risk of physical conflict; and (b) arresting protesters without individualized probable cause determinations are not enjoined, New Yorkers will continue to suffer irreparable harm to their constitutional rights.

### EIGHTH CAUSE OF ACTION

42 U.S.C. § 1983 – First Amendment – Municipal Liability for Retaliation Against Protected
Speech

Against City Defendants

241.    Plaintiffs repeat and reallege the preceding paragraphs as if set forth here.

242.    The City Defendants have implemented, enforced, encouraged, sanctioned, and/or ratified policies, practices, and/or customs that lead to retaliation against, and deterrence of, protected speech in violation of the First Amendment.  The City's unconstitutional policies, practices, and/or customs, include but are not limited to: (a) chilling, preventing or otherwise deterring protesters from engaging in protected speech on the subject of police brutality and

racial injustice, and (b) taking action against protesters pursuant to vague and ineffectual dispersal orders.

243.    Those policies, customs, or usages were a moving force behind the violation of Plaintiffs' First Amendment rights, and proximately caused Plaintiffs' injuries.

244.    Prior reports, lawsuits, and civil rights complaints have put City Defendants on notice, prior to the 2020 Racial Justice Protests, that NYPD officers were certain to confront large scale protests, and that officers had displayed a pattern of unconstitutional conduct at past large-scale protests.

245.    City Defendants acted with deliberate indifference to the likely violation of New Yorkers' First Amendment rights by failing to adequately train, supervise, and/or discipline NYPD officers to prevent such violations.

246.    Such violations are likely to recur at future large-scale protests in New York City.

247.    If City Defendants' policies, practices, and/or customs of (a) chilling, preventing or otherwise deterring protesters from engaging in protected speech in future on the subject of police brutality and racial injustice; and (b) taking action against protesters pursuant to vague and ineffectual dispersal orders are not enjoined, New Yorkers will continue to suffer irreparable harm to their constitutional rights.

### NINTH CAUSE OF ACTION

Common-Law Assault

Against Defendant City of New York

248.    Plaintiffs repeat and reallege the preceding paragraphs as if set forth here.

249.    On August 27, 2020, all Plaintiffs served notices of claim pursuant to General Municipal Law § 50-e upon Defendant-Officers for assault and battery.

250.     On January 21, 2021, the City conducted an examination of Senator Myrie pursuant to General Municipal Law § 50-h.

251.     On January 28, 2021, the City conducted an examination of Assemblywoman Richardson pursuant to General Municipal Law § 50-h.

252.     On May 29, 2020, Defendant-Officers placed Plaintiffs in imminent apprehension of harmful or offensive contact, proximately causing injury to Plaintiffs.

253.     Such contact would have been without provocation or lawful privilege.

254.     As a result of these acts, Plaintiffs suffered the damages alleged.

255.     Defendant-Officers are duly appointed police officers of the City of New York and were acting in the performance of their duties and within the scope of their employment at the time they committed these tortious acts against Plaintiffs.

256.     Defendant City of New York is liable for the damages alleged.

## TENTH CAUSE OF ACTION

Common-Law Battery

Against Defendant City of New York

257.     Plaintiffs repeat and reallege the preceding paragraphs as if set forth here.

258.     On May 29, 2020, Defendant-Officers, including Defendant Officer Jorge Perez and Defendant John Doe #1, made harmful or offensive bodily contact with Plaintiffs, proximately causing injury to Plaintiffs.

259.     Plaintiffs did not consent to harmful or offensive contact and such contact was without provocation or lawful privilege.

260.     As a result of these acts, Plaintiffs suffered the damages alleged.

261.     Defendant-Officers are duly appointed police officers of the City of New York and were acting in the performance of their duties and within the scope of their employment at the time they committed these tortious acts against Plaintiffs.

262.     Defendant City of New York is liable for the damages alleged.

**ELEVENTH CAUSE OF ACTION**

Common-Law False Arrest and Imprisonment

Against Defendant City of New York

263.     Plaintiffs repeat and reallege the preceding paragraphs as if set forth here.

264.     On May 29, 2020, Defendant-Officers, including Defendant Captain Joseph B. Taylor and Defendant Sergeant Giovanni Calderon, arrested Senator Myrie in the absence of probable cause that he had engaged in unlawful conduct.

265.     Defendant-Officers confined Senator Myrie without consent, authority, or lawful privilege.

266.     Senator Myrie was aware of the confinement and the confinement proximately caused him injury.

267.     At all relevant times, Defendant-Officers were acting under color of state law.

268.     Defendant-Officers are duly appointed police officers of the City of New York and were acting in the performance of their duties and within the scope of their employment at the time they committed these tortious acts against Plaintiffs.

269.     Defendant City of New York is liable for the damages hereinbefore alleged.

**TWELFTH CAUSE OF ACTION**

New York State Constitution – Article I, § 12 – Unlawful Seizure

Against Defendant City of New York

270.     Plaintiffs repeat and reallege the preceding paragraphs as if set forth here.

271.    Defendant-Officers, including Defendant Officer Jorge Perez and Defendant John Doe #1, seized Plaintiffs without the reasonable articulable suspicion of criminality required by Section 12 of Article 1 of the New York State Constitution.

272.    Plaintiffs were aware of their illegal seizure and the seizure proximately caused them injury.

273.    At all relevant times, Defendant-Officers were acting under color of state law.

274.    Defendant-Officers are duly appointed police officers of the City of New York and were acting in the performance of their duties and within the scope of their employment at the time they committed these tortious acts against Plaintiffs.

275.    Defendant City of New York is liable for the damages hereinbefore alleged.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that the Court grant the following relief:

A. Compensatory damages in an amount to be determined at trial;

B. Punitive damages against all Defendants except the City of New York in an amount to be determined at trial;

C. Injunctive relief declaring the Defendants' conduct and policies, practices, and/or customs pursuant to which officers employ excessive force and false arrest, suppress free speech and expression, and retaliate against protestors based on their message, to be unconstitutional;

D. Reasonable fees, costs, and expenses, including attorneys' fees under 42 U.S.C. § 1988;

E. Pre- and post- judgement interest to the fullest extent permitted by law; and

F. Any additional relief the Court deems just and proper.

Dated:  June 28, 2021

Respectfully submitted,

By:  _____

Sean Hecker
Joshua A. Matz
Alexandra Conlon (*admission pending*)
Louis W. Fisher
Anne O'Toole
Anne R. Yearwood

KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Tel: (212) 763-0883
Fax: (212) 564-0883
shecker@kaplanhecker.com
jmatz@kaplanhecker.com
aconlon@kaplanhecker.com
lfisher@kaplanhecker.com
aotoole@kaplanhecker.com
ayearwood@kaplanhecker.com

*Counsel for Plaintiffs Diana C. Richardson
and Zellnor Y. Myrie*